Stephen J. Hill (1493)
Robert S. Clark (4015)
Jonathan R. Schofield (8274)
PARR WADDOUPS BROWN GEE & LOVELESS
185 South State Street, Suite 1300
Salt Lake City, Utah 84111
Telephone:  801.532.7840
Facsimile:  801.532.7750

Thomas R. Meites (*pro hac vice pending*)
Michael M. Mulder (*pro hac vice pending*)
Jamie S. Franklin (*pro hac vice pending*)
MEITES, MULDER, MOLLICA & GLINK
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
Telephone:  312.263.0272
Facsimile:  312.263.2942

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PRIZEWISE, INC., a Nevada corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>OPPENHEIMER & CO., INC., a New York corporation,<br><br>    Defendant, | **COMPLAINT**<br><br>Case No. _____<br><br>Judge_____<br><br>Jury Trial Demanded |

Plaintiff PrizeWise, Inc. ("PrizeWise" or the "Company"), by its attorneys, hereby complains of defendant Oppenheimer & Co., Inc. ("Oppenheimer"), as follows:

## JURISDICTION AND VENUE

1. Plaintiff PrizeWise is a Nevada corporation having its principal place of business in Salt Lake City, Utah.

2. Defendant Oppenheimer, a brokerage and investment banking firm, is a New York corporation having its principal place of business in New York, New York.

3. The amount in controversy exceeds $75,000 exclusive of interest and costs.

4. This court has jurisdiction under 28 U.S.C. § 1332(a) based on diversity of citizenship.

5. Venue is proper in this district under 28 U.S.C. § 1391(a) in that defendant does business in this judicial district, a substantial part of the events giving rise to the claim occurred here, and plaintiff resides here.

## UNDERLYING FACTS

6. In 2003, PrizeWise's founders, including Steven L. Rinehart ("Rinehart"), developed a process for exchange of goods on the Internet (the "Process"). The Process was an online trading platform similar to eBay in which PrizeWise members could buy and sell products on the Internet. Items were posted for sale through sweepstakes-style auctions. A PrizeWise member wishing to acquire an item posted for sale bought coupons for $1.00, which entitled the member to various money saving offers from a number of online merchants, including Barnes &

Noble, FogDog and Amazon.  Included with each coupon was a free sweepstakes ticket, which the member could enter in any sweepstakes of his or her choice for the opportunity to win an item posted for sale by another member.  A member could also obtain free sweepstakes tickets by mailing a written request for the tickets to PrizeWise.

7. In late 2003, Plaintiff's founders applied for a business methods patent for the Process with the U.S. Patent and Trademark Office (Application Number:  10-769,671).

8. The founders outlined the Process in a business plan (the "Plan").  As described in the Plan, the Process was designed to generate revenue from four different sources: (a) a 17% commission on sales at auction, (b) payments from online merchants for coupons sold and distributed, (c) cost-per-impression advertising revenue from third party advertisers, and (d) interest earned on funds waiting to be paid to sellers while auctions were open.

9. In late 2003, PrizeWise's co-founder Rinehart distributed the Plan to a number of prospective outside investors, including 21st Century Technologies, Inc. ("TFCT").  TFCT was a publicly traded venture capital group, headquartered in Las Vegas, Nevada.

10. In December 2003, TFCT agreed to fund the new enterprise in exchange for 51% of the capital stock of PrizeWise, which the founders organized as a Nevada S-corporation for the purpose of bringing the Process to market.  Rinehart was named Chief Executive Officer and Chairman of the Board of Directors, and he and the other founders received the remaining 49% of PrizeWise's capital stock.  (Rinehart and the other founders are hereinafter collectively referred to as the "Minority Shareholders").  The other members of the Board of Directors were nominated by TCFT.

11. Between December 2003 and July 2004, TFCT contributed approximately $440,000 in operating capital to PrizeWise for its 51% interest in the Company.

12. In April 2004, PrizeWise opened its headquarters in Salt Lake City, Utah, and established a wholly-owned subsidiary in London, England, registered and doing business as "PrizeWise Limited."

13. By May 1, 2004, PrizeWise had created the PrizeWise website, which was a complex software program which allowed items to be sold and won and which comprised: (a) automatic credit-card processing and online check processing features; (b) registration and membership databases; (c) item and auction databases; (d) automatic emailing notifications; and (e) graphical interface features.

14. On May 20, 2004, PrizeWise officially launched its website in a fully operational capacity. TFCT issued several press releases in the weeks preceding PrizeWise's launch, notifying its shareholders and the public that PrizeWise would soon be operational and encouraging them to visit the non-operational beta site and pre-register.

15. Over 30,000 members registered for PrizeWise during its first six months of operation. By July 2004, PrizeWise had over $20 million worth of products for sale online, from baseball cards and coins to exotic cars, a yacht, planes and homes. By October 2004, PrizeWise was selling over 1,500 items per month. PrizeWise grossed approximately $725,000 in revenue in 2004. PrizeWise's gross revenues increased exponentially during its first six months of operations at an average rate of 26% per month.

16. Upon information and belief, at the time that TFCT invested in PrizeWise, it had

approximately 12,000 shareholders. The week of PrizeWise's launch (the week of May 21, 2004), TFCT's public stock price (or market capitalization) rose approximately 700%. By the end of May 2004, TFCT's market capitalization had risen from approximately $16 million (before TFCT invested in PrizeWise) to approximately $100 million.

17. Although TFCT had other investments, PrizeWise was TFCT's most significant asset. TFCT's sudden jump in its market valuation was based on its 51% interest in PrizeWise.

18. During the period from June through October of 2004, numerous potential business partners contacted PrizeWise.

19. During the summer of 2004, it became apparent that PrizeWise would benefit from additional capital. On September 10, 2004, TFCT and PrizeWise executed a Subscription Agreement granting TFCT the right to purchase additional shares of PrizeWise in three scheduled installments for the total amount of $950,000. Under the Subscription Agreement, if TCFT did not make the payment for the first installment or any subsequent installment, the Minority Shareholders had the right to make the payment and purchase the new shares covered by that and subsequent installments according to the schedule set forth in the agreement. The shares held by the Minority Shareholders, including all shares covered by Subscription Agreement, were freely transferable.

20. If TFCT paid all of the scheduled installments under the Subscription Agreement, TFCT's equity position in PrizeWise would increase by approximately 2.9% to 53.9% (or 1,050,000 out of 1,964,078 authorized and issued shares).

21. Based on TFCT's payment of $950,000 for 2.9% of PrizeWise, PrizeWise's fair

market value was at least $32.8 million in September of 2004.

22.     Between May and October of 2004 a number of potential investors also contacted PrizeWise, including defendant Oppenheimer.  According to its website, Oppenheimer "provides access to capital and strategic advisory services to a wide range of corporate clients with a concentration on emerging growth companies."  In September of 2004 Joseph Motley of Oppenheimer first contacted PrizeWise.  Upon information and belief, Joseph Motley worked in and/or managed a department of Oppenheimer that engaged in private equity investments.

23.     Between September and October of 2004, Rinehart had numerous discussions directly with Motley.  Motley communicated to Rinehart that Oppenheimer was interested in acquiring a controlling interest in PrizeWise or in working with the Minority Shareholders to jointly acquire a controlling interest.  Rinehart informed Motley that he and the other Minority Shareholders could not offer Oppenheimer a controlling interest at that time, as the Minority Shareholders collectively owned only 49% of PrizeWise.

24.     Upon information and belief, Motley contacted TFCT on at least two occasions to inquire about buying TCFT's 51% interest in PrizeWise, but was rebuffed.

25.     During the course of Rinehart's discussions with Motley, Gregg Grieve ("Grieve"), another agent of Oppenheimer, also contacted Rinehart regarding PrizeWise.  Most of Rinehart's communications with Motley and Grieve were via telephone, although some were by email.

26.     Oppenheimer and PrizeWise agreed from the outset of their communications that all discussions between PrizeWise and Oppenheimer, together with all documents and all non-

public information received from PrizeWise, were confidential.

27. The agreement was evidenced by and communicated in various communications. For example, when Rinehart provided documentation to Oppenheimer with his email on October 14, 2004, he stated in the email that, "We're trusting you to keep this confidential and use the information only for exploring an investment opportunity." *Id*. To the same effect, an attachment to the October 14, 2004, email contained the declaration, "ALL INFORMATION HEREIN CONTAINED MAY BE USED ONLY FOR CONSIDERING INVESTMENT OPPORTUNITIES IN PRIZEWISE BY OPPENHEIMER."

28. Rinehart proposed to Motley that, if TFCT failed to make its first installment payment under the Subscription Agreement by October 17, 2004, the Minority Shareholders would purchase the shares. They would then sell to shares to Oppenheimer at the Subscription Agreement price in return for Oppenheimer providing the funds needed to make the installment payments under the Subscription Agreement. Rinehart told Oppenheimer that he believed there was a possibility that TFCT would miss the first installment payment because a $7 million judgment had recently been entered against TFCT in a lawsuit in Texas brought against TFCT by a former TFCT officer.

29. The issuance of new shares to Oppenheimer pursuant to the Subscription Agreement, and in accordance with Rinehart's proposal, would reduce TFCT's interest in PrizeWise to less than 50%, and would collectively give Oppenheimer and the Minority Shareholders control of PrizeWise.

30. In response to Rinehart's proposal, Oppenheimer requested, and Rinehart

provided on the confidential basis set out above, copies of the Subscription Agreement, as well as sales figures, pro formas, legal opinion letters and other related documents to enable Oppenheimer to review the viability of the option of making the installment payments if TFCT missed them.

31.     Motley, on behalf of Oppenheimer, accepted Reinhart's proposal, agreeing that if TFCT failed to make the $350,000 installment payment by October 17, 2004, Oppenheimer would make that and the two subsequent installment payments under the Subscription Agreement in exchange for the newly issued shares.

32.     On the morning of October 17, 2004, TFCT timely wired the first installment payment of $350,000 to PrizeWise's business account.

33.     On October 18, 2004, after receiving telephone messages from Motley and an email from Grieve earlier that day inquiring about the status of the TFCT payment, Rinehart sent an email message to Motley and Grieve (the "October 18th Email") to inform them that, because TFCT had made the payment, he and the other Minority Shareholders could no longer offer Oppenheimer shares pursuant to the Subscription Agreement.

34.     In the October 18th Email, Rinehart expressed his desire to continue discussing an equity sale, saying "[w]e would like to see another partner involved," since there was no assurance that TCFT would make either of the two subsequent installment payments. Rinehart explained that it was important for PrizeWise's future that TFCT be replaced as majority shareholder. He stated that "we believe that they [TFCT] are committing gross negligence, even willful wreckless [sic] endangerment, in their handling of the site's future, and will sacrifice its

long-term viability for short term TFCT gain." He concluded that PrizeWise "would like to see another partner involved, or even sell out before TFCT ruins the site." (A copy of the October 18 e-mail is attached and made a part of this complaint as Attachment A.)

35. In the October 18th Email, Rinehart reiterated his expectation of confidentiality, stating: "I'll tell you something in confidence that I'd ask you to please keep that way . . . ." The sole recipients of the October 18th Email were Oppenheimer's Motley and Grieve.

36. It was obvious on the face of the October 18th Email that PrizeWise's views of its majority shareholder and its conduct constituted highly confidential information. It was also obvious that disclosure of the October 18th Email would be extremely harmful to PrizeWise, as it questioned the integrity and trustworthiness of TCFT, PrizeWise's majority shareholder, and suggested that TCFT would sacrifice the longevity of the company for short-term gain. In so doing, TCFT would undermine the confidence of PrizeWise's customers and thus reduce the likelihood that they would entrust their goods to PrizeWise for disposition or seek to acquire goods through the PrizeWise system.

37. Despite PrizeWise's insistence that information it provided to Oppenheimer be kept confidential, and Oppenheimer's agreement to do so, Oppenheimer caused the October 18th Email to be published virtually word for word on either October 18, 2004, or the next day, October 19th, on numerous heavily viewed Internet message boards which closely followed TCFT and PrizeWise. These included at least seven high-traffic websites in English where PrizeWise members would see it (and at least two high-traffic websites in foreign languages) including http://www.CBS.marketwatch.com, http://www.AllStocks.com,

http://www.RagingBull.com, http://www.thegulf.biz (in Arabic), http://www.stock-world.de (in German) and http://www.PrizeWise.net, a message board created independently by PrizeWise members only for the purpose of discussing PrizeWise.

38. Examples of such publications include the message posted on the Raging Bull message board on October 19, 2004, which is attached and made a part of this complaint as Attachment B.

39. Oppenheimer's dissemination of the October 18th Email was in violation of its agreement of confidentiality with PrizeWise, and was to the great harm and detriment of PrizeWise. This dissemination was done intentionally, knowingly and maliciously and with reckless disregard of the confidentiality agreement.

40. Approximately 4,700 messages were posted about PrizeWise on RagingBull.com between October 19 and December 31, 2004. During the same time period, thousands of messages were posted on the other message boards where the October 18th Email had appeared. Numerous PrizeWise members and TFCT shareholders who were also PrizeWise members saw the October 18th Email and posts commenting on the October 18th Email.

41. PrizeWise members posted thousands of comments on various message boards regarding Oppenheimer's post of the October 18th Email. From these it was evident that PrizeWise members feared that the disharmony between PrizeWise and TFCT had the potential to ruin PrizeWise's operations, that the value of tickets they acquired on the site would be lost, and that they would not receive proceeds from the disposition of goods they had entrusted to PrizeWise.

42. As a result of Oppenheimer's wrongful post of the October 18th Email, PrizeWise's sales began to fall within hours of that post.  PrizeWise's sales continued to fall drastically over the next weeks.

43. Within a period of five months, the wrongful dissemination of confidential information by Oppenheimer caused PrizeWise to lose almost all of its revenue and good-will value.

## FIRST CLAIM FOR RELIEF
### (Tortious Interference with PrizeWise's Economic Relations)

44. PrizeWise incorporates by reference in this claim for relief each of the allegations contained in the preceding paragraphs as though fully set forth herein.

45. Oppenheimer interfered with PrizeWise's economic relations for an improper purpose and/or by an improper means by its misconduct described above, including without limitation its posting of the October 18th Email on numerous Internet message boards.

46. As a result of such misconduct, PrizeWise's existing and potential members, customers and business partners lost confidence in PrizeWise's continued viability and, consequently, ceased doing business with PrizeWise or declined to enter into business relations with PrizeWise..

47. Oppenheimer's conduct damaged PrizeWise in an amount to be determined at trial.

48. Because the conduct of Oppenheimer was willful, malicious, and wanton, PrizeWise is entitled to an award of punitive damages against Oppenheimer in addition to its

actual monetary damages.

## SECOND CLAIM FOR RELIEF
### (Breach of Express Agreement of Confidentiality)

49. PrizeWise incorporates by reference in this claim for relief each of the allegations contained in the preceding paragraphs as though fully set forth herein.

50. PrizeWise provided information to Oppenheimer under an express agreement of confidentiality.

51. By its conduct described above, Oppenheimer breached the agreement of confidentiality. Such breach included, among other things, Oppenheimer's causing the confidential information contained in the October 18th Email to be published virtually word-for-word on either October 18, 2004, or the next day, October 19th, on numerous heavily viewed Internet message boards which closely followed TCFT and PrizeWise.

52. As a direct and proximate result of Oppenheimer's posting of PrizeWise confidential information, PrizeWise suffered substantial injury and damage in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Implied Agreement of Confidentiality)

53. PrizeWise incorporates by reference in this claim for relief each of the allegations contained in the preceding paragraphs as though fully set forth herein.

54. PrizeWise provided confidential information to Oppenheimer under an agreement of confidentiality. To the extent that an express agreement of confidentiality is not found,

PrizeWise conveyed information to Oppenheimer under an implied agreement of confidentiality.

55. Despite the implied-in-fact agreement of confidence between the parties, Oppenheimer breached the implied agreement of confidentiality. Oppenheimer's breach included, among other things, causing the confidential information contained in the October 18th Email to be published virtually word-for-word on either October 18, 2004, or the next day, October 19, on numerous heavily viewed Internet message boards which closely followed TCFT and PrizeWise.

56. As a direct and proximate result of posting the confidential information, PrizeWise suffered substantial injury and damage in an amount to be determined at trial.

WHEREFORE, PrizeWise demands judgment against Oppenheimer as follows:

1. Under Plaintiff's First Claim for Relief, for all damages, including all incidental and consequential damages, caused by Oppenheimer's tortious interference with PrizeWise's economic relations in an amount to be determined at trial.

2. Under PrizeWise's Second Claim for Relief, for all damages, including all incidental and consequential damages, caused by Oppenheimer's breach of the express agreement of confidentiality in an amount to be determined at trial.

3. Under PrizeWise's Third Claim for Relief, for all damages, including all incidental and consequential damages, caused by Oppenheimer's breach of the implied agreement of confidentiality in an amount to be determined at trial.

4. Under PrizeWise's First Claim for Relief, for an award of punitive damages as a result of Oppenheimer's willful, malicious, and wanton conduct.

5. Under all Claims for Relief, for PrizeWise's costs and attorneys' fees incurred in this action.

6. Under all Claims for Relief, for such other and further relief as the Court deems appropriate.

DATED this 16th day of October, 2007.

PARR WADDOUPS BROWN GEE & LOVELESS


 /s/ Stephen J. Hill
Stephen J. Hill
Robert C. Clark
Jonathan R. Schofield

MEITES, MULDER, MOLLICA & GLINK
Thomas R. Meites
Michael M. Mulder
Jamie S. Franklin

*Attorneys for PrizeWise*