IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PRIZEWISE, INC., a Nevada corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>OPPENHEIMER & CO., INC., a New York corporation,<br><br>    Defendant. | ORDER and MEMORANDUM DECISION<br><br><br><br><br>Case No. 2:07-CV-792 TC |

**INTRODUCTION**

PrizeWise, Inc., a startup company that developed an online trading platform through which users could purchase or sell products on the Internet using an auction/sweepstakes program, brought suit against Oppenheimer & Co., Inc. (Oppenheimer), a New York-based Investment Bank, after a confidential email sent to two Oppenheimer employees by PrizeWise's former CEO, Steve Rinehart, was disseminated through several Internet message boards. PrizeWise alleges that the publication of the email destroyed the company. Oppenheimer moves for summary judgment on the grounds that its employees did not have authority to bind Oppenheimer to the confidentiality agreement found in the email and that if one of its employees posted the email, he acted outside the scope of his employment in publicizing the email.

**BACKGROUND**

According to Mr. Rinehart, Oppenheimer employee Joseph Motley contacted him in early October 2004 to discuss Oppenheimer's desire to acquire a majority interest in Prizewise. Mr.

Rinehart claims that during their several conversations, Mr. Motely represented that he was a senior manager at Oppenheimer. This representation, if made, was not true. Mr. Motley worked in Oppenheimer's retail brokerage division and had no authority to acquire an interest in Prizewise on behalf of Oppenheimer. Seeking investment opportunities for Oppenheimer was not part of Mr. Motely's job description, although Oppenheimer would have paid him a finder's fee if ultimately, Oppenheimer had decided to invest in a company recommended by Mr. Motley.

During approximately this same time period, Mr. Motley touted shares in Twenty-First Century Technologies (TFCT), the company that held the majority of Prizewise shares, to other Oppenheimer employees and retail clients and sold shares to at least one client. Mr. Motley owned 637,000 shares of TFCT which comprised 99% of his retirement portfolio.[1]

Mr. Rinehart was very interested in finding a new investor for Prizewise because he was frustrated with the way TFCT was running the company. Mr. Rinehart had several conversations with Mr. Motely about Oppenheimer investing in Prizewise. In order to verify that Mr. Motley was legitimate, Mr. Rinehart browsed Oppenheimer's website and determined that it had an capital markets division. He also contacted Mr. Motley through a main Oppenheimer phone number and emailed Mr. Motley at an Oppenheimer email address. But he never attempted to verify Mr. Motley's position directly with Oppenheimer.

On October 14, Mr. Rinehart emailed Prizewise's agreement with TFCT and an executive summary of Prizewise to Mr. Motley. In that email Mr. Rinehart stated, "We're trusting you to keep this confidential and use the information only for exploring an investment opportunity." (Def. Br. Ex. 17). Mr. Motely responded, "Yes thanks, we will review and talk to you in the

---

[1] These shares were worth $68,796 on June 30, 2004, but declined to $2557.95 by December 31, 2004. (Def. Br. Ex. 11-12.)

am." (Id.) Over the next several days, Mr. Rinehart and Mr. Motley continued to talk about the possibility of Oppenheimer investing in Prizewise.

Gregg Grieve also worked for Oppenheimer in a different office from Mr. Motley; he did not work with Mr. Motley. Mr. Grieve was not employed to interact with clients, but instead to check transactions for accuracy. He had invested $2000 of his mother's in TFCT, but sold the shares on October 1, 2004 at a loss of about $1300. (Def. Br. Ex. C at 51-53.) He also spoke to friends and family about TFCT and the possibility of their buying shares in the company although Oppenheimer did not compensate him for this.

On October 18, 2004, Mr. Rinehart received an email from Mr. Grieve, asking how Prizewise picked winners were determined and why the stock price was declining. Mr. Rinehart did nothing to verify Mr. Grieve's position at Oppenheimer. Mr. Rinehart assumed, partly based on the "we" language used in Mr. Motley's reply to the October 14 email, that Mr. Grieve and Mr. Motley were working together. Mr. Rinehart replied to Mr. Grieve's October 18 email describing his concerns about TFCT's management of Prizewise (the "October 18 email"). Specifically, he stated that he believed that TFCT was "committing gross negligence, even willful [reckless] endangerment, in their handling of the site's future, and will sacrifice its long-term viability for short term TFCT gain." (Id. at Ex. 1). He also told Mr. Grieve that this information was being relayed "in confidence that I'd ask you to please keep that way." (Id.). Mr. Rinehart sent copies of the email to Mr. Motley, to his home email address and to four PrizeWise shareholders.

When he received the email, Mr. Grieve immediately showed it to a coworker. (Pl. Br. Ex. 21 at 36-39.) By the next morning, the October 18 email had been posted on at least five investment-related Internet message boards. All recipients of the email including Mr. Motley

3

and Mr. Grieve deny posting the email.

Other than the fact he received a copy of the October 18 email, there is no evidence to suggest that Mr. Motley posted the email. At oral argument, Prizewise attorneys suggested that perhaps Mr. Motley was motivated to publicize the email because he had lost money in his investment in TFCT shares. They also claimed at oral argument that Mr. Motley visited one of the investment-related message boards at work, but the documents provided to the court do not substantiate this allegation. There is, though, some indication that Mr. Grieve posted the October 18 email. Mr. Grieve was a member of several of the investment-related message boards where the email appeared. Mr. Grieve's statements about his message board involvement strain credulity. For instance, although he used "baseballmaster" as a user name on the message board on Allstocks.com, he denies using "baseballmaster0" on the Raging Bull message board, even though "baseballmaster0" guaranteed the accuracy of the previously posted October 18 email. Further, Mr. Grieve admits to posting the October 18 email on an Allstocks.com message board in January of 2005.

After the October 18 email appeared online, TFCT immediately terminated Mr. Rinehart's employment. Investors who read the email on the message boards voiced alarm about Prizewise's future and Prizewise's stock price declined substantially.

**ANALYSIS**

In this action, Prizewise has brought three claims against Oppenheimer: tortious interference with Prizewise's economic relations, breach of express agreement of confidentiality, and breach of implied agreement of confidentiality. Oppenheimer seeks summary judgment on all three claims.

<u>Summary Judgment Standard</u>

The court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must construe all facts and reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Oppenheimer contends that cannot be held liable for tortious interference because posting the October 18 email was outside the scope of Mr. Motley and Mr. Grieve's employment. Oppenheimer further argues that neither Mr. Motley or Mr. Grieve had sufficient authority to bind Oppenheimer to keep confidential the information relayed about Prizewise. Prizewise counters that the court should not consider only the transmission and posting of the October 18 email, but the entire course of conduct between Mr. Motley and Mr. Rinehart to determine whether posting the email was within the scope of employment and whether Mr. Motley or Mr. Grieve had apparent authority to bind Oppenheimer to confidentiality. The court grants summary judgment for Oppenheimer because Prizewise has produced no evidence that Mr. Motley intentionally interfered with Prizewise's economic relationships; Mr. Grieve was not acting in the scope of his employment if he posted the email; and Oppenheimer did not create apparent authority in either Mr. Motley or Mr. Grieve to bind Oppenheimer to a confidentiality agreement.

<u>Intentional Interference with Economic Relationships</u>

Oppenheimer argues that Prizewise has not shown that Oppenheimer tortiously interfered with Prizewise's economic relationships because even if Mr. Motley was acting within the scope of his employment when he misled Mr. Rinehart about his position with Oppenheimer, Mr. Motley did not intend to interfere with Prizewise's economic relationships. In order to demonstrate intentional interference with economic relationships, "the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." Ferguson v. Williams & Hunt, 2009 UT 49, ¶ 35, 221 P.3d 205 (internal quotation marks omitted). The first prong of tortious interference requires <u>intentional</u> interference. Interference is intentional "even if the defendant does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur as a result of defendant's action and is a necessary consequence thereof." Mumford v. ITT Commercial Fin. Corp., 858 P.2d 1041, 1044 (Utah 1993). The second prong of tortious interference requires the plaintiff to show either improper purpose or improper means. An individual acts with an improper purpose when the predominant motivation for interference is to injure the plaintiff. Anderson Dev. Co. v. Tobias, 2005 UT 36, ¶ 20, 116 P.3d 323. In such a case, the defendant's interfering actions are improper only because they interfere. Improper means, on the other hand, are used when "the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." Pratt v. Prodata, Inc., 885 P.2d 786, 787 (Utah 1994) (internal quotations omitted).

Prizewise argues that Mr. Motley, acting within the scope of his employment, intentionally interfered with its economic relationships because his actions lead Mr. Rinehart to send the October 18 email to Mr. Grieve. Specifically Prizewise argues that Mr. Motley's

misrepresentation to Mr. Rinehart about his position with Oppenheimer and his failure to report the receipt of material inside information as required by the Oppenheimer employee manual and possibly by securities laws constitute improper means of interference. But Prizewise fails to show that Mr. Motley intended to interfere. No evidence supports that Mr. Motley posted the October 18 email or that he in any way communicated with Mr. Grieve about the October 18 email. Without the posting of the October 18 email, there was no interference with Prizewise's economic relationships. Even if Mr. Motley was acting within the scope of his employment when he interacted with Mr. Rinehart, he did not intend to interfere with Prizewise's economic relationships. Because intentional interference with economic relationships is an intentional tort, it does not matter whether the dissemination of the October 18 email was a foreseeable consequence of Mr. Motley's deception.

<u>Mr. Grieve Did Not Post the Email Within the Scope of His Employment</u>

Mr. Grieve, on the other hand, meets the "intentional" prong of a tortious interference claim. At the very least he should have known that posting the October 18 email would be likely to interfere with Prizewise's economic relationships with TFCT. But Mr. Grieve did not act within the scope of his employment if he posted the email, and so Oppenheimer cannot be liable for his interference.

Under Utah state law, an employee acts in the scope of employment if his actions "[are] of the kind which he is employed to perform, occur[] substantially within the authorized limits of time and space, and are actuated, at least in part, by a purpose to serve the master." <u>Birkner v. Salt Lake County</u>, 771 P.2d 1053, 1056 (Utah 1989) (internal quotation marks omitted). If reasonable minds can differ on whether an employee acted within the scope of employment when committing tortious actions, the question must be submitted to the jury. <u>Clover v. Snowbird Ski</u>

7

Resort, 808 P.2d 1037, 1042 (Utah 1991). A real estate agent who fraudulently extended a listing agreement was acting within the scope of his employment because he was employed to obtain listings and market homes and because if his marketing efforts were successful the sale of the home would benefit his employer. Wardley Better Homes and Gardens v. Cannon, 2002 UT 99, ¶ 27, 61 P.3d 1009. On the other hand, in an alienation of affection claim, an employee's romantic relationship with another employee was outside the scope of employment even though the relationship began at work and occurred during work hours because the relationship was not related to the work the employee was hired to perform and did not benefit the company. Jackson v. Righter, 891 P.2d 1387, 1391 (Utah 1995).

Neither Mr. Grieve's email to Mr. Rinehart nor his alleged posting of the October 18 email were of the kind of actions that Oppenheimer employed him to perform. As a "back office" transaction checker, Mr. Grieve was not hired to interact with clients at all. Although he occasionally corresponded with Mr. Rinehart during business hours from his computer, including the email he sent that precipitated the October 18 email, his motivation in contacting Mr. Rinehart was a personal interest in Prizewise. Satisfactory answers to the questions he posed to Mr. Rinehart in his email would not have benefitted Oppenheimer. Further, if Mr. Grieve posted the contents of the October 18 email, he was disobeying Oppenheimer policy without providing Oppenheimer with any conceivable benefit. Assuming Mr. Grieve posted the October 18 email, he did not do so within the scope of his employment. Therefore, Oppenheimer did not intentionally interfere with Prizewise's economic relationships.

The court grants summary judgment for Oppenheimer on Prizewise's tortious interference claim.

### Neither Mr. Motley nor Mr. Grieve Had Apparent Authority to Bind Oppenheimer to Mr. Rinehart's Confidentiality Request

Prizewise argues that Mr. Motley had apparent authority to bind Oppenheimer to a confidentiality agreement.[2] Prizewise takes the position that Oppenheimer created this apparent authority by providing Mr. Motley with an Oppenheimer email address and phone number and negligently allowing Mr. Motley to make misrepresentations to Mr. Rinehart. Oppenheimer disagrees, pointing out that under Utah law on apparent authority, Mr. Rinehart was required to make a reasonable effort to verify either Mr. Motley or Mr. Grieve's position with the company.

Mr. Motley's actions could not, by themselves, be sufficient to create apparent authority for him to bind Oppenheimer to an express or implied confidentiality agreement. "[I]n order to cloak a presumptive agent with authority, 'the principal [must have] manifested his . . . consent to the exercise of such authority or [have] knowingly permitted the agent to assume the exercise of such authority.'" Workers' Comp. Fund v. Wadman, Corp., 2009 UT 18, ¶ 10, 210 P.3d 277. A principal has created apparent authority in an employee when the evidence shows:

> (1) that the principal has manifested his [or her] consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his [or her] position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

Luddington v. Bodenvest, Ltd., 855 P.2d 204, 209 (Utah 1993) (internal quotations omitted).

---

[2]Oppenheimer does not contest that if Mr. Motley and Mr. Grieve had authority to bind Oppenheimer to keep the contents of the October 18 email confidential then their actions were sufficient to bind Oppenheimer to do so. The court is not certain this is the case. Prizewise bases their claim for a contract on Mr. Motley's response to the October 14 email, where he agreed to keep the information Mr. Rinehart transmitted confidential. But Mr. Motley's agreement to keep the October 14 email confidential seems limited to the contents of that email. The October 18 email from Mr. Rinehart contains only the unilateral statement that Mr. Rinehart was sharing the information "in confidence that I'd ask you to please keep that way." This does not seem sufficient to form a confidentiality agreement.

Utah law places an obligation on the individual who does business with a company's agent to verify the agent's authority to contract for the company. Zions First Nat'l Bank v. Clark Clinic Corp., 762 P.2d 1090, 1095 (Utah 1988) ("[O]ne who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations."); Bodell Constr. Co. v. Stewart Title Guar. Co., 945 P.2d 119, 124 (Utah Ct. App. 1997) (holding that plaintiffs "were under an obligation to ascertain the scope" of an escrow company's agency to act on behalf of the company that issued s title insurance policy). In Zions First Nat'l Bank, the Utah Supreme Court held that a managerial employee who had a signature stamp for an authorized representative of a company did not thereby have apparent authority to act in the company's behalf. Zions First Nat'l Bank, 762 P.2d at 1095. Even though Zions Bank was aware that the employee of a corporate banking client had managerial status and was in charge of the company's office, the bank acted unreasonably when it relied this information and the employee's possession of a signature stamp to give the employee a loan in the company's name. Id.

  Similarly here, Mr. Rinehart unreasonably relied on Mr. Motley's representations about his authority as an Oppenheimer investment banker based on the fact that Oppenheimer had an capital markets division and Mr. Motley had an Oppenheimer telephone number and email address. Mr. Rinehart's failure to verify Mr. Motley's position defeats Prizewise's argument that Mr. Motley had apparent authority to bind Oppenheimer to a confidentiality agreement. Mr. Rinehart had even less reason to believe Mr. Grieve could bind Oppenheimer to a confidentiality agreement. Based on Mr. Grieve's email address and Mr. Motley's statement that "we" would be in touch with him, Mr. Rinehart assumed that Mr. Grieve had the authority to bind Oppenheimer to a confidentiality agreement even though Mr. Grieve never made any

representations at all about his position at Oppenheimer. If Mr. Grieve and Mr. Motley had apparent authority to bind Oppenheimer based on these facts, all employees with company-issued email addresses and phone numbers would have the authority to bind their employers.

<u>Brokerage Firms Are Not Held to a Higher Standard Than Other Companies in Business Disputes</u>

Prizewise argues repeatedly that the court should hold Oppenheimer to a high standard of supervision of its employees because it is a brokerage firm. But the cases Prizewise cites in support of that argument deal with brokerage firm employees that violate federal securities laws and defraud members of the investing public. Mr. Rinehart was not a member of the investing public, and Prizewise does not bring claims against Oppenheimer for violations of federal securities law. Further, any alleged violation by Oppenheimer of the SEC's supervision requirements do not change Oppenheimer's liability under the common-law doctrines of respondeat superior and apparent agency authority.

Prizewise particularly relies on <u>Holloway v. Howerdd</u>, 536 F.2d 690, 696 (6th Cir. 1976). In this case, the Sixth Circuit imposed liability on a brokerage firm for its employee's sale of unregistered stock and related fraud even though the firm was unaware of the employee's sale and received no profit. <u>Id.</u> The court reasoned that the brokerage firm had an affirmative obligation to protect the investing public from the misuse of the firm's prestige. <u>Id.</u> But in <u>Holloway</u>, the employee was employed to sell securities and the actions he took were of the type "usually done in connection with the transactions he [was] employed to conduct." <u>Id.</u> Here, Mr. Motley and Mr. Grieve were not employed by Oppenheimer to invest Oppenheimer funds in businesses, and Mr. Rinehart was not a member of the investing public but rather the CEO of a business. <u>Holloway</u> does not apply to the facts of this case.

Prizewise also cites <u>Commerford v. Olson</u>, 794 F.2d 1319, a case where the Eighth

11

Circuit reversed a district court for not submitting the question of apparent authority to the jury. In Commorford, a bond salesman working for a brokerage firm told his ailing aunt that he would invest her money for a higher return than she received in her checking account. Instead, he converted the funds for his own personal use. When the aunt called the brokerage firm to check on her investment, a representative of the brokerage firm told her that the bond salesman was on a leave of absence, but did not inform her that he was not licensed to sell securities. The Eighth Circuit held that the district court should have submitted a special verdict form to the jury on the apparent authority issue because the bond salesman used company stationary in communications with the victim and because the brokerage firm did not inform the victim that the bond salesman was not licensed to sell securities when she called to inquire after her account. Commerford is also distinguishable from the facts before the court. Although Mr. Motley and Mr. Grieve used their company email addresses to correspond with Mr. Rinehart, neither was employed by Oppenheimer to invest in businesses, and Mr. Rinehart never attempted to verify their position with Oppenheimer.

**CONCLUSION**

The court GRANTS summary judgment for Oppenheimer. Mr. Motley did not have the intent to interfere with Prizewise's economic relationships, and Mr. Grieve acted outside the scope of his employment if he posted the October 18 email. Further, Oppenheimer did not give either Mr. Motley or Mr. Grieve apparent authority to bind Oppenheimer to a confidentiality agreement.

SO ORDERED this Second day of April, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief District Judge